# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF OHIO
# EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>MITCHELL A POWERS,<br><br>Defendant. | CASE NO. 2:22-CR-117(16)<br><br>JUDGE SARGUS |

## GOVERNMENT'S SENTENCING MEMORANDUM

On January 30, 2024, this defendant appeared before the Court and pled guilty to a Superseding Information charging him in Count One with Conspiracy to Distribute and Possess with Intent to Distribute Fentanyl and Crack Cocaine within 1,000 Feet of an Elementary School, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A)(iii), 841(b)(1)(A)(vi), 846, and 860, and in Count Two with Use of a Facility of Interstate Commerce in Aid of Racketeering, in violation of 18 U.S.C. § 1952(a)(3)(A).

The United States Probation Office has calculated the defendant's adjusted offense level. The PSR notes that the base offense level for Count One was calculated as 34. A total of six points were added to that based on the defendant maintaining a premises (+2), being a manager or supervisor within the DTO (+3), and the activities of the DTO occurring within 1,000 feet of a school (+1). The base offense level for Count Two was calculated as 14 and an additional 6 points were added based on the defendant's use of coercion (+4) and his role as a manager or supervisor (+2). After grouping and acceptance, the total offense level was 34 and the Defendant's Criminal History Category was calculated as I. The PSR noted that United States Sentencing Guidelines ("U.S.S.G.") advisory guideline range is 210-262 months.

However, in the Plea Agreement, parties agreed that the relevant conduct attributed to the defendant resulted in a base offense level of 30 (instead of the base level of 34 as determined by the Probation Officer) for Count One. In that same Plea Agreement, the parties agreed that the defendant would receive no adjustment for his role pursuant to U.S.S.G. §§ 3B1.1 or 3B1.2. The parties also agreed that no role enhancement would apply to Count Two as well although the base offense level and four level increase pursuant to § 2G1.1(b)(1) increase were contemplated. The parties also agreed that a three-level decrease pursuant to U.S.S.G. §3E1.1 for his acceptance would be applied, resulting in an offense level of 30 after acceptance and grouping. If this Court follows the terms of the Plea Agreement, then his guideline range would be 97-121 months.

**Defendant's Objections**

The defendant raises three objections to the PSR. First, in Objection One, the defendant objects to the relevant conduct assessed to the defendant in the PSR. The PSR calculates an amount of relevant conduct that corresponds to an offense level 34. The parties have recommended to the Court in the plea agreement that the amount of relevant conduct attributable to this defendant is between 1,000 kg and 3,000 kg of converted drug weight which would correspond to an offense level 30. While the determinations made by probation may be legally accurate, the government intends to abide by the agreements regarding the guidelines that are contained in the Plea Agreement as outlined above.

Objection Two and Three relate to the defendant's role in the offenses, as the PSR assesses points under U.S.S.G. §§ 3B1.1 or 3B1.2 for leadership. Again, the determinations made by probation may be legally accurate, but the government intends to abide by the agreements regarding the guidelines that are contained in the Plea Agreement as outlined above which indicate that no adjustment for the defendant's role should be applied.

Objection Four relates to the safety valve provision under § 5C1.2. The "safety valve" provision of the federal sentencing statute requires a district court to ignore any statutory mandatory minimum and instead follow the Sentencing Guidelines if a defendant was convicted of certain nonviolent drug crimes and can meet five sets of criteria. See 18 U.S.C. § 3553(f)(1)-(5). However, the defendant is not eligible for the safety valve based on his offense of conviction. Specifically, the government concurs with the presentence investigation report which found that the Safety Valve provision at U.S.S.G. § 5C1.2, does not apply in this case. The government advises that the defendant is disqualified from the application of 18 U.S.C. § 3553(f) because the offense of conviction occurred within 1,000 feet of a school.

### Title 18 U.S.C. § 3553(a) Factors

After the Court makes a finding as to the applicable advisory guideline range, the Court is to consider the factors listed in 18 U.S.C. § 3553(a) before imposing a sentence. Among other things, these factors include:

1) the nature and circumstances of the offense and the history and characteristics of the defendant;
2) the need for the sentence imposed--
    A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
    B) to afford adequate deterrence to criminal conduct;
    C) to protect the public from further crimes of the defendant; and
    D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

While the Court should take into account each of the above factors, (1) through (2)(D), the United States can offer facts in connection with the two phrases included in 18 U.S.C §3553(a)(1), the nature and circumstances of the offense, and the history and characteristics of Defendant.

## Facts Underlying the Guilty Plea

The facts set forth in the plea agreement are as follows:

In 2021, numerous federal law enforcement agencies initiated an investigation into a Drug Trafficking Organization (DTO) operating in Columbus, Ohio led by Patrick Saultz and Cordell Washington. The DTO was engaged in a large-scale conspiracy involving narcotics distribution, sex trafficking, fraud, and money laundering. The investigation revealed that the DTO was bringing large quantities of illegal narcotics into Columbus, Ohio, which were being sold in and around the Columbus area while simultaneously being used to coerce individuals to engage in sexual activity for profit, from which the DTO benefited. More specifically, the investigation revealed that from approximately 2008 to June 29, 2022, members of the DTO, under the control of either Saultz, Washington, or both, trafficked various controlled substances – including fentanyl, cocaine, crack cocaine, heroin, methamphetamine, marijuana, oxycodone, and alprazolam – to individuals in northern Ohio, Columbus, and West Virginia.

Saultz and Washington remained leaders of the DTO throughout the timeframe it operated, and they brought in numerous others to assist in facilitating the drug activities for the DTO. These individuals were designated to operate different residences that functioned as drug distribution houses where the DTO sold the illegal drugs directly to customers and collected the proceeds of the drug sales for Saultz and / or Washington.

The investigation revealed Saultz began distributing illegal narcotics, specifically heroin, cocaine, and crack cocaine, as early as 2008 from his residences on Vida Place and South Hague Street in Columbus, Ohio.  Saultz continued to distribute narcotics out of various residences on the west side of Columbus from approximately 2008 until 2012 when he began working with Washington as a partner.  Washington and Saultz both held joint leadership roles in the DTO and

would purchase large amounts of different narcotics, including kilogram quantities of cocaine, methamphetamine, and fentanyl, to package for resale from houses they owned, occupied, or rented between 2012 through 2022.  The DTO, under the direction of Saultz and Washington, continued to operate by distributing the controlled substances secured by Saultz and Washington from the DTO houses Saultz and Washington oversaw through June 29, 2022, when numerous members of the DTO, including Saultz, were arrested.

During the course of the investigation into the DTO, the defendant was identified as an individual who helped distribute illegal narcotics to drug purchasers and oversaw day-to-day operations at numerous DTO locations to include 655 South Eureka, 201 South Hague, 3235 Sullivant Avenue, 635 Racine Avenue, and 776 Chestershire Road, all in Columbus, Ohio.  The defendant joined the DTO in approximately 2017 after being introduced to members of the DTO via another drug user.  The investigation revealed in November 2017, the defendant began to sell crack cocaine and fentanyl for Saultz and Washington from 655 South Eureka which was the defendants' own residence.  The defendant began working with Tyler Bourdo and Anthony Frierson who helped assist day-to-day drug distribution out of the Eureka DTO residence.  When the house supply was low, the defendant would go with Frierson or Bourdo to either 715 South Burgess or 559 South Burgess, both of which were within 1,000 feet of Burrough Elementary School in Columbus, Ohio, to get a resupply of the drugs from either Washington or Saultz.  the defendants' role in the DTO elevated and eventually, he would remain physically outside of the DTO locations but be on standby in case the house needed to be resupplied, at which point, he would go directly to Saultz and Washington for the necessary drugs.  This oversight by the defendant over the DTO locations continued at other DTO locations, including 776 Chestershire, which was overseen by the defendant but ran by Frierson and other known DTO associates to

include Darrel Fields and Melissa Humphrey. The defendant would pay the owner of the 776 Chestershire house $100 a day and $100 a night to continue to sell illegal narcotics out of it.

On June 16, 2021, a search warrant was executed at 776 Chestershire at the time when the defendant was in charge of that DTO location. Pursuant to that search warrant, numerous items were seized from Chestershire including drug paraphernalia in the form of tinfoil packages, syringe depositories, and Narcan as well as approximately $450 in United States currency including buy money from an undercover drug sale at that location. Approximately fifteen individuals were inside the house at the time the warrant was executed, including a number of individuals who were known drug users and victims of sex trafficking as identified throughout the investigation of this DTO. When law enforcement arrived on scene, they also observed Frierson, who was then arrested. Search warrants from Frierson's cellphones were obtained and revealed several videos which showed a Wi-Fi camera in the basement of 776 Chestershire. In those videos recovered from that camera, Darrel Fields, can be observed cutting and preparing drugs at a table. When the defendant oversaw the Chestershire address, he would provide Frierson, Fields, or Humphrey a bag of narcotics which consisted of approximately four to five grams of fentanyl and crack cocaine, at least two times a day and at most, four to five times a day, and each bag was worth approximately $1,500-$1,550. The defendant, after this search warrant execution, left his role in the DTO.

In addition to distributing illegal narcotics to drug purchasers and overseeing DTO locations, between 2017 through 2022, several DTO members provided drugs to numerous adult female women who frequented the DTO locations and who were addicted to illegal drugs. The DTO members who supplied these women with illegal drugs included the defendant, Saultz, Bourdo, Price, Tinsley, and Frierson. The locations where these females resided included

residences on Hague Avenue, Racine Avenue, Vida Place, South Eureka Avenue, Chestershire Road, and South Ogden Avenue in Columbus, Ohio. At any given time, approximately ten or more females were residing within these residences, all of whom were addicted to illegal narcotics that were provided to them by the defendant and other DTO members.

Specifically, the defendant provided numerous females "fronts" or "block hits," which the investigation revealed was a term for an advance on small amounts of cocaine, crack cocaine, heroin, and/or fentanyl. These "fronts" or "block hits" ensured that the females not be in active drug withdrawal and suffering from physiological and physical harm such as agitation, vomiting, muscle cramping, and chills, from their drug addiction. If the females were going through withdrawal, they were unable to engage in commercial sex acts, to include oral and vaginal intercourse with customers, thereby making less profits from which the DTO ultimately benefitted. After receiving a "front" or "block hit" from the defendant, the females would then leave the DTO house, walk to Sullivant Avenue, and meet with customers to engage in oral or vaginal intercourse. In exchange, these females would receive cash payments, and this occurred multiple times a day. The females would then return to the DTO residence and provide the defendant and other DTO members with the money they made from the various sex acts. The defendant and his co-defendant, Frierson, also received payments for sex acts that the different females engaged in via CashApp. If Frierson received money from the prostitution activities the females engaged in via CashApp, he would then deposit it into a Chime account that was run by the defendant. For example, per CashApp subpoena returns, between December 15, 2020 and May 4, 2021, a total of 1,022 transactions totaling $54,549 were conducted on Cash App accounts related to the defendant and Frierson.

The females were allowed to remain in the DTO residences controlled by the defendant if

they continued to make money for the residence by engaging in sex acts for money; this money would go back to the defendant and/or allow them to pay off the debt from their "front" or "block hit" that he and other DTO members provided.   The females within the various DTO locations overseen by the defendant were only allowed to stay at the DTO residences if they continued to make money from the commercial sex acts they engaged in.   Sources of information throughout the investigation confirmed various females engaged in a "rinse and repeat" cycle where they would be allowed to stay at a DTO residence, receive a block hit, go work the street and have sex for money, pay the debt from the block hit, and then be allowed to remain at the house.   Those sources also verified the money made by the DTO came from both the drug and prostitution efforts of the females within the houses and that some of the drug-addicted females brought in hundreds of dollars per day.

## Seriousness of the Offense

This is a very serious offense as evidenced by the mandatory minimum term of 10 years under the statute passed by Congress under 21 U.S.C. § 841(b)(1)(A). In this case, the defendant is personally responsible for an amount which corresponds with a converted drug amount of 1,000 KG but less than 3,000 KG.   This DTO was engaged in selling very dangerous and addictive drugs including cocaine, cocaine base and fentanyl. Fentanyl is a very addictive and very dangerous drug. Even in very small quantities, fentanyl can be very dangerous.  NCHS, National Vital Statistics System. Estimates for 2020 are based on provisional data. Estimates for 2015-2019 are based on final data (available from: https://www.cdc.gov/nchs/nvss/vsrr/drug-overdose-data.htm). More than 150 people die every day from overdoses related to synthetic opioids including fentanyl. *Id.*   Likewise, cocaine and cocaine base are very addictive and dangerous drugs.   Therefore, this is a very serious and dangerous offense which calls for a lengthy sentence.

In addition, the defendant was involved in the trafficking of women for commercial sexual activity, specifically he was one of the DTO members who supplied commercial sex workers with illegal drugs. These sex workers would stay at the DTO drug house and receive 'fronts' before their shifts and return with money after their shifts to purchase drugs and to use the drugs at the house. At any given time, approximately ten or more females were residing within these residences, all of whom were addicted to illegal narcotics that were provided to them by the defendant and other DTO members.

Also, the defendant was one of the codefendants who received payments for sex acts that the different females engaged in via CashApp.

### History and Characteristics of the Defendant

The defendant is 36 years of age. PSR ¶ 3. He is single, he is in a long-term relationship, and he has one child of his own and raises another child with his girlfriend. PSR ¶ 114. He attended high school through the 10th grade when he stopped attending so that he could work. PSR ¶ 129. He later received his GED. PSR ¶ 130. He attended five semesters at Columbus State Community College. PSR ¶ 131. He has a consistent work history since 2021, working at Distinctive Marble and Granite before moving on to earn a higher wage at Decker Construction. PSR ¶ 132-133).

He has one criminal history points resulting from his involvement in drug trafficking as a result of his addiction. PSR ¶ 103-107.

### Conclusion

The United States would respectfully request that the Court impose a sentence within the guideline range of 97-121 months. A sentence within this guideline range would be sufficient, but not greater than necessary, to reflect the seriousness of the offense, promote respect for the law,

provide just punishment for the offense, afford adequate deterrence to criminal conduct, and protect the public from further crimes perpetrated by the Defendant.

Respectfully submitted,

KELLY A. NORRIS
Acting United States Attorney

s/Timothy D. Prichard
TIMOTHY D. PRICHARD (0059455)
EMILY CZERNIEJEWSKI (IL 6308829)
Assistant United States Attorneys

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing Sentencing Memorandum was served this 25th day of April, 2025 electronically on counsel for the defendant.

                                                   s/Timothy D. Prichard
                                                   TIMOTHY D. PRICHARD (0059455)
                                                   Assistant United States Attorney